BENJAMIN B. WAGNER
United States Attorney
HEATHER MARDEL JONES
Assistant United States Attorney
United States Courthouse
2500 Tulare Street, Suite 4401
Fresno, California 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorney for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) VERIFIED COMPLAINT FOR |
| v. | ) FORFEITURE *IN REM* |
| 1993 CESSNA 550 FIXED WING MULTI-ENGINE AIRCRAFT, SERIAL NO. 550-0725, TAIL NO. N725CC, | ) |
| Defendant. | ) |

Plaintiff, United States of America, by and through its undersigned attorney, in a civil case of forfeiture *in rem*, alleges as follows:

**Nature of Action**

1.  This is a civil action *in rem* to forfeit to the United States of America a 1993 Cessna 550 Fixed Wing Multi-Engine Aircraft, Serial No. 550-0725, Tail No. N725CC (hereafter "defendant aircraft").

2.  The defendant aircraft constitutes or was derived from proceeds traceable to violations of 18 U.S.C. §§ 1341(Mail Fraud), 1343 (Wire Fraud), 1956 (Money Laundering) and 1957 (Money Laundering), offenses punishable by more than one year's imprisonment and is therefore subject to forfeiture to the United

1          VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

States pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 982(a)(1); and 28 U.S.C. § 2461.

3. The defendant aircraft was seized on or about June 6, 2009 and is currently in the custody of the United States Marshals Service, Eastern District of California.

**Jurisdiction and Venue**

4. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345 and 1355.

5. This Court is the proper venue pursuant to 28 U.S.C. § 1395, because the United States' claim accrued in this district and the property to be forfeited was found in this district.

6. Pursuant to Federal Rule of Civil Procedure, Rule 9(h), this case is designated as a case within the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. This case is governed by Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and pursuant to Rule G(9), trial is to be to the Court unless any party demands trial within 14 days in compliance with Federal Rules of Civil Procedure, Rule 38.

**Background of Investigation**

7. On or about May 8, 2009, the Federal Bureau of Investigation (hereafter, "FBI"), began investigating the business activities of John Winfield Otto (hereafter "Otto"), doing business as HL Leansing, Inc. ("HL"), Heritage Pacific Leasing ("HPL"), Manufacturer's Acceptance Corporation ("MAC"), Center Point Financial ("CPF"), and Air Fred, LLC ("Air Fred"), all interrelated companies. The investigation into Otto's business activities began when a cooperative witness (hereafter "CW"), who was also an executive employee at HL and HPL, advised FBI agents that s/he believed Otto was operating a Ponzi scheme. The CW further advised that over 1,000 investors nationwide were involved in this scheme and that

the investors stood to lose over $138 million.

8.  The investigation revealed that Otto was the CEO/owner of the aforementioned businesses, which he had started in Fresno, California approximately 25 year previous. According to executives with Otto's businesses he (Otto) claimed that he had an exclusive arrangement with American Express in which he could purchase blocks of smaller equipment leases at a 20% discount. Otto's companies then sold these "investments" to client investors in the form of "collateralized loans," in which investors' funds were allegedly loaned to HL and/ or related companies to acquire the equipment leases, and the loans were purportedly secured by those leases. Investors were promised "guaranteed" interest rates of anywhere from 8 to 14 percent on the amounts invested in the loans, which typically matured after one to three years.

9.  The CW was provided with an unsigned Promissory Note between American Express Company and HL in the principal amount of $107,900,420.00, which purportedly was to mature on February 3, 2009. The CW advised that s/he relied on this Promissory Note in compiling HL's financial statements and in HL's internal bookkeeping. When the CW asked Otto for additional documentation, Otto would state that additional information would not be provided. Otto advised the CW that the signed Promissory Note as well as other important documents were maintained at his home office located at his residence address of 49355 Sunrose Lane in Palm Desert, California.

10. On May 11, 2009, the FBI provided the purported Promissory Note to American Express company officials. On May 12, 2009, American Express Global Security confirmed to the FBI that the Promissory Note was fraudulent.

11. The CW stated to agents that s/he started becoming concerned in 2008 as s/he saw available funds diminishing while sales of loans to investors seemed to be at an all time high. The CW's repeated requests in person and telephonically to Otto concerning this issue were not answered by Otto. Monthly payments due to

1  investors had risen to $2 million, and in recent months Otto had transferred funds
2  into the HL business account in order for payments to be made.  This was done via
3  bank wire transfers from Otto's bank accounts in Palm Desert and/or Palm Springs.

4       12.    According to the CW, HL was unable to send out the interest payments
5  that were due to its investors on April 25, 2009.  This was the first time HL was
6  unable to send out interest payments to investors.  Otto advised HL employees that
7  interest payments would be delayed two weeks pending the close of escrow on the
8  sale of the company to an undisclosed buyer, and promised that payments would go
9  out no later than May 8, 2009.

10       13.    On April 28, 2009, Otto sent out a letter to all investors, that stated, in
11  part, that HL would not be able to make its April 25th payment because the firm
12  was in the process of being sold and the closing date was expected to be May 8,
13  2009.  Otto stated in the letter, which was sent to investors via e-mail, facsimile,
14  and U.S. Mail:

15           "Until this agreement is consummated HL will freeze all accounts.  No
16           payments will be made and no new monies will be accepted by HL
17           Leasing.  I will do everything in my power to speed this transaction up,
18           so as to get your check to you as quickly as possible."

19       14.    The CW advised that Otto routinely would take $25,000 out of HL
20  accounts every month for his "consulting" fee.  The CW now believes Otto used HL
21  accounts as his personal "piggy bank."  The CW recalled to agents that a couple
22  years prior, Otto had the CW transfer $3 million to his personal account in Palm
23  Desert.  According to the CW, Otto stated that it was just for "show" so he would be
24  able to purchase a bank in Mankato, Minnesota, and although the deal did not go
25  through, Otto never transferred the funds back, even after repeated requests by the
26  CW.

27       15.    W.H. was identified as one of the victims of the HL Leasing, Inc.
28  fraudulent investment scheme.  W.H. stated to agents that he was referred to an

1 employee of HL Leasing through friends who had been doing business with HL and
2 that on February 15, 2009, he (W.H.) provided this same employee with a check for
3 $750,000.00. W.H. stated that in March 2009, he received a call from the HL
4 employee advising that HL has 4 or 5 openings for short-term notes and that these
5 were the last "9% leases" available. On March 5, 2009, W.H. provided the HL
6 employee a check for $250,000.00 for a grand total investment with HL of
7 $1,000,000.00. W.H. advised that he only received one interest payment on his
8 investment prior to the collapse of HL.

9      16.    M.A. was identified as one of the victims of the HL Leasing, Inc.
10 fraudulent investment scheme. After being introduced to an HL employee and
11 being advised by this employee that HL Leasing had never lost a penny for a
12 client/investor, M.A., decided to place her monies with HL, in an attempt to re-coup
13 monies M.A. lost in the previous year on the stock market. On March 5, 2009, M.A.
14 wire transferred $165,000.00 to HL's account at California Bank & Trust. M.A.
15 stated that she only received one interest payment in the amount of $1,125.00 at
16 the end of March 2009.

17      17.    N.B. was identified as one of the victims in the HL Leasing, Inc.
18 fraudulent investment scheme. At the time of HL's collapse, N.B. had $1.25 million
19 invested with the company. N.B. stated to agents that he began investing in 2004,
20 at which time HL was offering returns around ten to ten and one-half percent. N.B.
21 recalled the time in May 2004, that he and his wife drove to Fresno, California to
22 meet with an HL employee at which time he specifically asked the employee if this
23 investment was a Ponzi scheme. N.B. stated that the employee laughed and
24 reassured him that this was not the case.

25      18.    R.O. was identified as one of the victims in the HL Leasing, Inc.
26 fraudulent investment scheme. R.O. stated to agents that at first he was a bit leery
27 about investing with HL, as he had been a victim in a previous unrelated Ponzi
28 scheme. R.O. stated that in 2008, he decided to drive down to Palm Desert,

California with his wife to Otto's residence/home office to meet with Otto "face-to-face." R.O. stated that there he found a luxurious estate with all the trimmings. R.O. stated further that both Otto and his wife, Kathy, who represented that she was part of HL, showed R.O. and his wife around and that it was clear from this meeting that Otto was extremely wealthy and seemed to know a lot about the leasing industry. Additionally, R.O. stated that he made contact with a HL employee in the Fresno, California office in attempt to make doubly sure that his investment in HL would be safe. After observing the way in which HL Leasing appeared to be conducting business, R.O. decided to invest his pension plan on September 29, 2008, for a total of $130,000.00. In March 2009 at the persistence of the HL employee R.O. wired an additional $39,000.00 to the bank accounts of HL. The company collapsed shortly thereafter.

19. Review and analysis of documents of HL Leasing and the related companies, as well as interviews with bank personal and the CW, revealed that Otto and HL Leasing controlled all of the defendant bank accounts and none of the other related companies could have survived independently without regular infusions of funds from HL Leasing.

20. Review and analysis of financial records demonstrates that, for example, in just the few months prior to the collapse of the Ponzi scheme, from February 2009 to March 10, 2009, identified victims of the fraud scheme deposited approximately $619,000.00 into HL Leasing, Inc. bank account at California Bank and Trust.

21. Analysis and review of HL's records, which included Otto's personal financial statements, and interviews of HL's Chief Financial Officer (CFO) and Controller, has determined that Otto purchased significant items using investor-originated funds.

22. The CW also advised that in 2004 Otto used investor-originated HL Leasing funds to purchase a jet (hereafter "defendant aircraft") for approximately

$2.85 million. The purchase of the defendant aircraft enabled Otto to establish Air Fred, LLC, which was purportedly in the business of renting out the defendant aircraft for profit. Financial analysis of an HL Leasing bank account located at County Bank (hereafter "HL Leasing Account xxx5515") revealed that on September 20, 2004, $2,765,00.00 was transferred from HL Leasing Account xxx5515 into an Air Fred, LLC bank account located at County Bank (hereafter "Air Fred Account xxx5513"). On September 20, 2004, Air Fred Account xxx5513 wire transferred $2,760,000.00 into an escrow account for the purchase of the defendant air craft.

23. Analysis of the related bank accounts and transfers of monies, revealed that the commingled funds transferred to Air Fred for the purchase of the defendant aircraft in 2004 were sourced from accounts into which victim-investor funds were deposited.

24. According to records filed to register the defendant aircraft, the aircraft is owned by Air Fred LLC, a limited liability company registered in California on February 24, 2003. The members of Air Fred LLC are listed as Manufacturer's Acceptance Corporation, dba Heritage Pacific Leasing which is "wholly owned by John & Kathleen Otto." The Chief Financial Officer, and agent for service of process, is listed as Andy Fernandez.

**FIRST CLAIM FOR RELIEF**
**[18 U.S.C. § 981 (a)(1)(C) and 28 U.S.C. § 2461]**

25. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 24 above.

26. Plaintiff alleges that defendant aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, as it constitutes or was derived from proceeds traceable to violations of 18 U.S.C. §§ 1341(Mail Fraud), 1343 (Wire Fraud) 1956 (Money Laundering) and 1957(Money Laundering), offenses punishable by more than one year's imprisonment.

///

## SECOND CLAIM FOR RELIEF
**[18 U.S.C. § 981 (a)(1)(A)]**

27. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 26 above.

28. Plaintiff alleges that defendant aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), as it constitutes property, real or personal, facilitated or was involved in a transaction or attempted transaction, or is property traceable to, violations of 18 U.S.C. §§ 1956 (Money Laundering) and 1957 (Money Laundering), offenses punishable by more than one year's imprisonment.

## THIRD CLAIM FOR RELIEF
**[18 U.S.C. § 982(a)(1)]**

29. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 28 above.

30. Plaintiff alleges that defendant aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(1), as it constitutes or was derived from proceeds traceable to, and/or facilitated or was involved in a transaction or attempted transaction, or is property traceable to, violations of 18 U.S.C. §§ 1956 (Money Laundering) and 1957 (Money Laundering), offenses punishable by more than one year's imprisonment.

WHEREFORE, plaintiff prays as follows:

1. Process issue according to the procedures of this Court in cases of action *in rem*;

2. Any person having an interest in said defendant aircraft be given notice to file a claim and to answer the complaint;

///
///
///
///

3. This Court enter a judgment of forfeiture of said defendant aircraft to the United States; and

4. For such further relief as the Court deems just and proper.

DATED: May 30, 2013

BENJAMIN B. WAGNER
United States Attorney

/s/ Heather Mardel Jones
HEATHER MARDEL JONES
Assistant U.S. Attorney

9   VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

## VERIFICATION

I, Michael G. Taylor, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and belief are in the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: May 17, 2013

/s/ Michael G. Taylor
Michael G. Taylor
Special Agent
Federal Bureau of Investigation

(original signature retained by attorney)